ESTATE of MAY—SOUTH DAKOTA CONFERENCE ASSOCIATION OF SEVENTH DAY ADVENTISTS, Appellant v. CHRISTENSEN, Respondent

(220 N.W.2d 388)

(File No. 11344. Opinion filed June 20, 1974)

**Tidball, Blando, Kemnitz & Axtmann,** Pierre, for proponent and appellant.

**Arnold Pfeiffer,** Parker, for contestant and respondent.

DUNN, Justice.

This action was commenced by the service of Notice of Hearing Petition for Probate of Holographic Will of one John R. May, deceased, by South Dakota Conference Association of Seventh Day Adventists, Appellant, upon Eva W. Christensen, Respondent. Objections were filed by the respondent and hearing was held in the District County Court in and for Turner County on May 4, 1973. On July 10, 1973 the District County Court filed its decision denying probate of the Will and Findings of Fact and Conclusions of Law and Judgment were entered. Motions for rehearing and for a new trial by the appellant were denied. This is an appeal from the judgment and denial of a rehearing or a new trial.

The decedent lived alone on a farm a few miles from Parker, South Dakota. He executed a document on December 28, 1967 entirely in his own handwriting purporting to dispose of his property upon his death. There was no question raised of undue influence or of testamentary capacity. The decedent told Victor Brandt on at least two occasions that he did have a will, the last time being approximately three days before his death. On February 14, 1973 John R. May died in Turner County, South Dakota.

Mrs. Eva Christensen, respondent and a sister of the deceased, searched the decedent's home and bank boxes thoroughly after his death but could find no will. Mrs. Christensen, the sheriff of Turner County and others went through the papers of the deceased in his home; some papers were destroyed and others piled into boxes and stored in a rented barn near the home of a niece, Eva Brandt. Later, Mrs. Brandt found the contested will[1] with the papers moved to the barn and in a box of documents which also contained current receipts, bills, bank statements and current business records of the deceased.

The document purporting to be an Holographic Will is hereby set out in full, showing where it was cut out of the book on the right margin, and where it was torn on the left margin.

---

1.  The original will was attached to the Petition for Probate of Holographic Will. It was referred to throughout the testimony as Exhibit 1, but it is not marked as an exhibit and it was not offered in evidence at the trial. Further, the record book from which the sheet of paper was cut, on which the purported Holographic Will was written, is marked Exhibit 1, but was not offered or received in evidence. However, we are considering the Holographic Will as a part of the record, as the original was filed with the Petition.

There is no evidence to show what happened to the document from the date it was executed to the date it was found. It came from decedent's home and the inference would be that it was in decedent's possession at least until the date of his death. All of the witnesses testified that decedent's home was a mess with important documents as well as worthless scraps of paper piled around the house without any system or order. In the light of these facts the trial court ruled that the Holographic Will had been torn and obliterated by the decedent during his lifetime with the intent and for the purpose of revoking the same in accordance with SDCL 29-3-1 which states:

> "Except in the cases in this chapter mentioned, no written will, nor any part thereof, can be revoked or altered, otherwise than:

> (1) By a written will or other writing of the testator, declaring such revocation or alteration, and

executed with the same formalities with which a will should be executed by such testator; or

(2) By being burnt, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by some person in his presence and by his direction."

In considering this statute we should also refer to SDCL 29-3-3:

"A revocation by obliteration on the face of the will may be partial or total, and is complete if the material part is so obliterated as to show an intention to revoke;   *   *   *."

As there was no extrinsic evidence that decedent intended to destroy the will, the trial court of necessity in reaching its decision had to rely on the presumption generally set out in 57 Am.Jur., Wills, § 550, which reads as follows:

"It is generally agreed that if a will produced for probate, which is shown to have been in the custody of the testator after its execution, was found among the testator's effects after his death, in such a state of mutilation, obliteration, or cancelation as represents a sufficient act of revocation within the meaning of the applicable statute, it will be presumed, in the absence of evidence to the contrary, that such act was performed by the testator with the intention of revoking the instrument.   *   *   *   Whatever presumption arises from acts of cancelation or mutilation is rebuttable, but the burden of the rebuttal rests upon the proponent."

■ Proponent of the will rebuts this presumption by evidence that the decedent told Victor Brandt (husband of Eva Brandt, niece of decedent) that he had a will on two different occasions, the last time being some three days before his death. This testimony was corroborated by Mrs. Brandt to the extent that her husband had advised her of decedent's statements at the time that they were made. No other will was ever found. Mrs. Brandt would be an heir of the decedent if the will was not upheld and would take nothing under the will. Accordingly, the testimony of the Brandts on this subject is most credible and convincing and any presumption of intent to revoke the will arising from the

tearing while in the possession of the decedent was effectively rebutted. In Fleming v. Fleming, 367 Ill. 97, 10 N.E.2d 641, it is stated:

"Any act of tearing of the paper on which the will is written, however slight, is an act of tearing within the meaning of this statute if done with intent to revoke the will, but it is likewise true that no act of tearing or cutting, unless it be with the intention to revoke the will, accomplishes such purpose. The intent with which the act is done governs. * * * The tearing or cutting of a portion of a will with an intent to revoke a part of it cannot amount to a revocation of the will in this State.

Such is, at most, but an attempt to revoke a portion of the will, and the original will, if its contents can be determined, will be probated."

Thus the trial court's finding No. 6, that the will had been revoked "by tearing and obliterating same with the intent of revoking" is clearly erroneous under the evidence as there was no actual evidence of an intent to revoke, and the presumption of intent arising from the tearing was effectively rebutted. See SDCL 15-6-52(a).

The next question is whether the contents of the document itself can be determined so as to provide for the disposition of decedent's property.

First it should be noted that the date, the signature, and the fact that it is decedent's will are intact. Reasonable men could not differ that the document provides for the payment of any doctor and hospital bills not covered by medicare. It provides that Esther (sister) gets $1200.00; Eva (sister) gets $1200.00; and Laura's (deceased sister) two adopted girls receive $600.00 each. It provides that Ed May (brother) gets $1.00. [2]

---

2. It also gives the reason for the difference in the bequests. There is evidence in the record that his mother's will was not upheld as it was not dated. The sisters had honored the intent of the will and quit-claimed property to the deceased. The brother did not agree to this and some settlement had to be made with him in order for deceased to obtain title to 80 acres of land he had actually purchased himself. Thus the language "they 'onnerd' mothers will" found in the document.

This takes care of the special bequests, after which comes the words "of what I have goes to S D A Conference at Pierre, So. D—who ever is president—frence at that time can be—point the administrator." No one contests that the decedent was referring to the Seventh Day Adventist Conference at Pierre, South Dakota in this sentence, and again reasonable men could not differ that the document calls for the rest of his property, after the special bequests, to go to the Seventh Day Adventist Conference and that its president be appointed administrator.[3]

■ Following the residuary clause, there seems to be some special instructions as to the broom factory and supplies which were on the farm. The document gives no inkling of what the decedent had in mind for this particular property. The words "to go into our" could refer to "our academy" as he once told the Brandts he would like to give this broom factory to one of the South Dakota Adventist academies; or it could just as well refer to "our family." In any event it is such an infinitestimal part of this $55,000 estate that it should not be controlling in this decision, and the property could become a part of the residuary after the definite special bequests are made, or be treated as property not covered by the will.

■ It is concluded that the opponents of the will have not established that the Holographic Will executed by the testator on December 28, 1967 was ever revoked "By being burnt, torn, canceled, obliterated or destroyed with the intent and for the purpose of revoking the same * * *." The presumption of intent to revoke arising from the torn document has been rebutted and the will effectively provides for the disposition of decedent's property. Every effort should be made by the courts to uphold a will that has been validly executed. As the only evidence here on earth to indicate decedent's desires as to the disposal of his property upon his death, the Holographic Will should have been upheld.

Judgment reversed.

All the Justices concur.

3. The decedent was a practicing, tithe-paying, Seventh Day Adventist during his lifetime. He had once discussed with Mr. Brandt "how much to give to my church".